## ZECKENDORF *v.* STEINFELD.

## STEINFELD *v.* ZECKENDORF.

### APPEALS FROM THE SUPREME COURT OF THE TERRITORY OF ARIZONA.

Nos. 139, 140. Argued March 15, 1912.—Decided June 7, 1912.

One of the parties interested in and having control of a mining company purchased a neighboring group of mines and agreed that the company should have the opportunity of taking them on reimbursing him for outlay; if not availed of, he to keep them for his own. Subsequently the combined groups being sold he claimed the agreement had by reason of certain resolutions been rescinded and that he was entitled to the proceeds of the purchased group. The case was twice before the Supreme Court of the Territory: on the first appeal that court held that the agreement had been rescinded. *Held* that:

The findings of fact sent up from the territorial court must alone be the basis of the judgment of this court.

In interpreting the action of stockholders in passing resolutions regarding the relative rights of the corporation and one of the stockholders and officers in property of the corporation, the surrounding facts and circumstances may be considered.

The agreement that the company could acquire the purchased group was carried out and not rescinded.

Whatever effect the decision of the Supreme Court of a Territory may have, as the law of the case, on the lower court or on the Supreme Court itself, prior to an appeal to this court, it is not the law of the case for this court.

Under the circumstances, the appointment of a receiver and his continuance for final settlement of the affairs of the company was proper.

THE facts, which involve the construction of contracts relating to sale of mining properties in Arizona, are stated in the opinion.

*Mr. Frank H. Hereford* and *Mr. Edwin A. Meserve* for appellant in No. 139 and appellees in No. 140.

*Mr. Eugene S. Ives,* with whom *Mr. Francis J. Heney* was on the brief, for appellees in No. 139 and appellants in No. 140.

MR. JUSTICE DAY delivered the opinion of the court.

Louis Zeckendorf brought this suit in the District Court of Pima County, Territory of Arizona, as a stockholder of the Silver Bell Copper Company, hereinafter called the Silver Bell Company, for and on its behalf, against Albert Steinfeld, J. N. Curtis and R. K. Shelton, as individuals and as officers and directors of the Silver Bell Company, the Silver Bell Company, and a certain company known as the Mammoth Copper Company. He sought to recover $338,710.15 for so much money wrongfully appropriated by and to the use of the defendant Steinfeld, which rightfully belonged to the Silver Bell Company, and to recover, as belonging to the company, 300 shares of stock in the Silver Bell Company. There was also a prayer for an accounting and the return of the money and shares and

for the appointment of a receiver. Steinfeld answered that the money, a portion of which was the proceeds of certain mining properties which had belonged to him and had been sold in conjunction with properties belonging to the Silver Bell Company, and shares of stock belonged to him and for reasons set forth were rightfully in his possession.

The District Court, upon the first trial, found in favor of Zeckendorf. This judgment was reversed by the Supreme Court of Arizona and the case sent back for further findings. (10 Arizona, 221.) The pleadings were amended, the amended complaint dividing the controversy into two causes of action, the first embracing the ownership of the proceeds of sale taken by Steinfeld and the second the title to the 300 shares of stock and dividends thereon. Upon the second trial the District Court found against Zeckendorf on the first cause of action and against Steinfeld on the second cause of action upon the facts found, made certain provisions as to attorney fees, and, in view of the situation of the Silver Bell Company, appointed a receiver and ordered that the property and the assets of the company be turned over to him for distribution according to the order and judgment of the court, and that upon final hearing the Silver Bell Company be dissolved, its debts paid and assets distributed among the stockholders according to their rights. The court further ordered that Steinfeld should hold in his hands the sum of $25,750 to secure him against his liability as garnishee in a case by one Franklin against the Silver Bell Company, Steinfeld to account to the company for the mora ton the final determination of the action. An appeal was again taken to the Supreme Court of the Territory of Arizona, and that court affirmed the judgment and orders of the District Court. (12 Arizona, 245.)

Both parties appealed. No. 139 is the appeal of Zeckendorf from that part of the judgment dismissing on the

merits his first cause of action, concerning the moneys paid to Steinfeld. No. 140 is the appeal of Steinfeld from the order and judgment holding that the 300 shares of stock belong to the company and requiring him to account for the dividends thereon. The Supreme Court of the Territory made elaborate findings of fact, adopting the findings of the District Court and making certain findings of its own. So far as necessary to determine the case as we view it, the findings may be summarized as follows:

Since 1878 Albert Steinfeld and Louis Zeckendorf have been partners under the firm name of Louis Zeckendorf & Company. Zeckendorf lived in the city of New York. Steinfeld resided in the city of Tucson, Arizona, and was the active member of the firm in its mining operations. William and Julia Zeckendorf were the owners of a certain mine known as the Old Boot or Mammoth Mine, which was being operated by one Carl Nielsen, under contract with Steinfeld as trustee of the owners. Nielsen became so indebted to the partnership that, in order to secure such indebtedness, in January, 1899, a company was incorporated under the laws of Arizona known as the Nielsen Mining & Smelting Company, the name being changed on January 14, 1901, to the Silver Bell Mining Company, and all the stock of the company was originally issued to Carl Nielsen, in consideration of the transfer to the company of his rights in the Old Boot mine, and a like transfer of personal property used in working the mine. The stock was divided as follows: 499 shares to L. Zeckendorf & Company, 30 shares to Albert Steinfeld, trustee of William and Julia Zeckendorf, 170 shares to J. N. Curtis, 300 shares to Carl Nielsen and one share to R. K. Shelton, but being in fact the property of L. Zeckendorf & Company. In January, 1901, the 300 shares in Nielsen's name were transferred on the books of the company to the name of Albert Steinfeld, trustee. On the sixth of June, 1903, the 499 shares of L. Zeckendorf & Company were

divided, 250 shares to Louis Zeckendorf and 249 shares to Albert Steinfeld, Steinfeld taking the one share standing in the name of Shelton which was in Steinfeld's possession until December 9, 1903, when it was given to Shelton. At the meetings of the stockholders Steinfeld voted the stock in his name as trustee and the stock of L. Zeckendorf & Company, and Louis Zeckendorf was never at any stockholders' meeting and did not vote therein by proxy until the stockholders' meeting of December 26, 1903, at which he was present. Subsequent to January 14, 1901, Albert Steinfeld, J. N. Curtis and R. K. Shelton were the directors of the corporation, all residing in Tucson, Arizona. Shelton was at all times the representative of Steinfeld on the board of directors of the company, and at all times involved in this action voted as ordered, directed and requested by Steinfeld. After June 6, 1903, J. N. Curtis, as director and other officer of the Silver Bell Company, was under the dominion and control of Steinfeld and did as he directed.

In the year 1900 Steinfeld purchased, in his own name and in the name of the Mammoth Copper Company, which was owned and controlled by him, certain mining properties in the neighborhood of the Old Boot Mine, known as the English Group of Mines, and in September, 1900, proceeded to Europe, and there concluded the purchase of the English title to that group.

The findings of fact sent up to us, and which must alone be the basis of our judgment (*Eagle Mining Co.* v. *Hamilton*, 218 U. S. 513, 515), show that Steinfeld, in purchasing the English Group of mines, did not purchase them with the intent that they should thereby become the property of the Silver Bell Company, but that at that time he purposed to give the Silver Bell Company an opportunity to take the mines upon reimbursing him for his outlays and expenditures in that connection, which he expected the Silver Bell Company would do, intending, if it did not,

to keep them for his own. In our view, the facts found show that Steinfeld and the company effectually carried out this purpose, and that the subsequent attempt to rescind the action by which the proceeds of the sale of the English Group of mines became the property of the Silver Bell Company and to give the proceeds to Steinfeld must be held for naught.

The findings show that after the acquisition of the English Group of mines Steinfeld turned them over to the possession of the Nielsen Mining and Smelting Company (the name of which was subsequently changed to the Silver Bell Copper Company), which assumed the possession and control of them; that they were operated in connection with the other mining property of the company, known as the Old Boot Mine; that maps were prepared, under the direction of Steinfeld, showing the mining properties as one entire group of mines, and that the president of the company made reports of the mines as the properties of the Silver Bell Company; that these maps and reports were sent to Zeckendorf and others, and that efforts were made by Steinfeld to sell the properties as a whole, including the English Group.

In the early part of 1901, Curtis, who was president of the Silver Bell Company, holding certain shares in his own right, contended that the English Group of mines was held in trust by Steinfeld for the Silver Bell Company. Both parties consulted one Franklin, an attorney, who advised that Steinfeld could not hold the properties as his own until he had given the company an opportunity to take them upon reimbursing him for his outlays and expenses and it had declined to do so.

Steinfeld acquiesced in this position and on July 15, 1901, made a proposition in writing to the Silver Bell Company. The substance of this proposal was that he would hold in trust for the Silver Bell Company all the mining properties controlled by him, the company to as-

sume all obligations, counsel fees, etc., to pay for the annual assessment work and to reimburse him for his outlays on or before the fifteenth of October, 1901 (and that he would also turn over the Nielsen stock in controversy in the second cause of action upon the assumption of certain obligations). And upon compliance with the terms of the proposition the mining properties were to belong to the Silver Bell Company. Steinfeld stated in this proposal:

"I am of the opinion that all of the mining claims and mill sites and property acquired, as above set forth, by the Mammoth Mining Company and by myself, are of great value to you, and that your company should own the same, and as an inducement to you to purchase and acquire the same, I am willing to place you in my shoes, that is to say, to sell and convey to you all the interest so acquired by me, upon my being repaid the amounts of money I have expended, with interest, and upon your assuming and guaranteeing with security satisfactory to me the performance on your part, of all the matters and things and payments which under the various contracts I am liable or responsible for. To this end I herewith submit to you the following proposition."

The Silver Bell Company was given until October 15, 1901, to accept the proposition; and, in the event it failed to do so and to comply therewith by such date, the option was to be at an end. This proposition was presented to the board of directors on July 15, 1901, and it was ordered that a meeting of the stockholders should be called to decide upon it. Another meeting of the directors took place October 1, 1901, at which Steinfeld stated that he would agree, on condition that the company pay for the assessment work done and to be done in 1900, 1901 and 1902, and pay interest for the interval on the amount named in his original proposition, to extend the time for acceptance of his proposal to the fifteenth day of September, 1902. This proposition of extension was accepted by

the board, and it was further resolved that a stockholders' meeting should be called not later than September 15, 1902, and a stockholders' meeting was held later on that day, October 1, 1901, but Zeckendorf was not present and no action was taken. And the Silver Bell Company continued to possess, use and work the properties as its own with the full knowledge and consent of Steinfeld and the Mammoth Copper Company.

In this situation of affairs Steinfeld negotiated the sale of all of the properties, and on May 13, 1903, reported to the board of directors that he had, on behalf of himself, the Mammoth Copper Company and the Silver Bell Company, given an option for the sale of the properties for $515,000, as one entire property, and requested that his action be confirmed, which was done; Steinfeld himself voting in favor of such confirmance. At the time the price of $515,000 was fixed Steinfeld intended to renew and permit the corporation to accept the terms of his proposition of July 15, 1901, as extended, and the officers of the Silver Bell Company expected the corporation to avail itself of the offer, so that the whole of the purchase money would be paid to and become the property of the Silver Bell Company. On May 20, 1903, all the properties were conveyed to the Imperial Copper Company for the purchase price of $515,000, $115,000 in cash and the balance in notes payable in four equal quarterly instalments. The cash and notes were turned over to Steinfeld as the treasurer of the Silver Bell Company and were to be held by him under a certain agreement, dated May 20, 1903, which permitted Steinfeld to hold the money and notes as indemnity for the obligations and liabilities to the Imperial Copper Company which he had assumed, the latter company having required Steinfeld to guarantee the titles to the mines sold for one year. It was mutually agreed in the agreement of May 20, 1903, that the purchase price paid and to be paid upon the sale should belong to

the Silver Bell Company.  Between May 20, 1903, and January 20, 1904, the Imperial Copper Company paid to Steinfeld, as treasurer and trustee of the Silver Bell Company $319,487.50, representing the cash payment and the proceeds of the first two notes, with interest, out of which money was paid $118,000, including $18,117 to Steinfeld. In October and November, 1903, Steinfeld sent all the money, except $50,000 which had been attached in his hands at the suit of Franklin, to the Bank of California, at San Francisco, California, and deposited it there in his individual name.

On the day the contract of May 20, 1903, was executed, the board of directors held a meeting, Steinfeld, Curtis and Shelton being present, at which the president reported the various transactions attending the sale and submitted certain documents.  He further reported that Steinfeld, who had conducted the negotiations with the Imperial Copper Company, had again submitted for acceptance his proposition of July 15, 1901, with the modifications that the company forthwith pay him in cash the sum of $18,117, being the sum named in the original proposal with interest, and assume all obligations incurred in past and present negotiations and transactions with respect to such mining properties, and the president stated that it was necessary to adjust with the Mammoth Copper Company the disposition of the purchase money, and submitted the agreement of May 20, 1903.  Five several resolutions were thereupon unanimously adopted: (1) Ratifying the sale; (2) accepting Steinfeld's proposition and directing the payment forthwith of the $18,117 and providing for certain other payments; (3) authorizing the payment of certain commissions on the sale; (4) fully empowering the president and secretary of the company to indemnify Steinfeld against loss or damage for having guaranteed the titles to the properties; and (5) specifically ratifying and approving the agreement of May 20, 1903,

providing for the disposition of the proceeds of the sale and indemnifying Steinfeld. And on the day following, May 21, 1903, the $18,117 was paid to Steinfeld. Zeckendorf was not at this meeting or any of the meetings except the stockholders' meeting on December 26, 1903.

In December, 1903, Zeckendorf brought a suit in California to enjoin the bank there from turning over to Steinfeld the moneys and notes so deposited by him, and obtained an injunction restraining Steinfeld from receiving and the bank from delivering to him the money and notes.

Thereafter, on December 26, 1903, a stockholders' meeting was held in Tucson, Arizona, all the stockholders and the respective attorneys of Zeckendorf and Steinfeld being present, and it·was at this meeting, it is contended, that the action theretofore taken vesting the proceeds of sale in the Silver Bell Company was rescinded. The Supreme Court of Arizona, on the first appeal of this case to that court (10 Arizona, 221), found that such rescission was accomplished, notwithstanding the stockholders may have intended to do no more than rescind the indemnity feature of the former agreement and resolutions, and sent the case back for findings of fact as to the ownership of the English-Group of mines and also of the 300 shares of stock, and as to the rights of the parties as to the distribution of the proceeds of the sale. This conclusion as to the rescission of the agreement of May 20, 1903, it is said, has become the law of the case and binding in its subsequent stages. Whatever might be the holding of the Supreme Court of Arizona as to the effect of this decision upon its own judgment and that of the District Court, the case reached this court for the first time upon the present appeal, and certainly the holding of the Supreme Court of Arizona at any of the stages of the case prior to this appeal would not be the law of the case for this court. *United States* v. *Denver & Rio Grande Railroad Co.,* 191 U. S. 84, 93.

We cannot agree with the Supreme Court of Arizona that the effect of this stockholders' meeting was to rescind so much of the former action as vested the proceeds of the sale in the Silver Bell Company. Nor can we agree, as the court held, that, if the parties did intend to rescind only the former action as to the custody of the proceeds of the sale, they made a mistake only as to the legal effect of the rescinding resolution. On the other hand, we think it is apparent from a consideration of the proceedings of that meeting, which the Supreme Court of Arizona has made a finding of itself, that the objection of Zeckendorf, the principal stockholder other than Steinfeld, was to so much of the former action as pertained to the turning over of the proceeds of the sale to Steinfeld to be held by him for his indemnity. At the meeting no disposition was manifested to give Steinfeld the ownership of the proceeds of the sale of the English mines nor to treat any modification of the former action as a rescission of the entire matter.

The discussion at that meeting throughout shows that the object of Zeckendorf was to get the money and the proceeds of the notes into the hands of a treasurer of the company who would give security therefor, and to have the entire proceeds of the sale divided among the stockholders. There was no intimation that the money or notes then held by the treasurer would be taken from the Silver Bell Company and one-half thereof turned over to Steinfeld as the vendor of the English Group of mines. As the counsel of Steinfeld said: -

"We are unwilling to admit that we did not have the right to this money. We still assert that this resolution and agreement was honest and valid, and that Mr. Steinfeld, under it, had the right to this money, and had the right to act as he has done. But since you attack it, we are willing to agree to pass a resolution in the language of your prayer in which we will rescind the resolution and

agreement, and *relinquish all right whatever to the personal custody of that money, and turn it over to the company.*

"Now, I drew a little resolution, which I would suggest one of you gentlemen (I am not a member of the board) should offer." (Italics ours.)

Thereupon the resolution in the following language was offered:

"Resolved, that the agreement executed on May 20th by the President and Secretary of the corporation, the Mammoth Copper Company and Albert Steinfeld, be and the same is hereby rescinded and that the said agreement and resolution passed on said day be declared null and void."

After the resolution had been offered and before the vote was taken, counsel for Steinfeld said further:

"We are acquiescing in your demand. . . .

"We will now organize as a stockholders' meeting.

"Our desire is in good faith to rescind that resolution, *but we will never admit we acted wrongfully in taking the money;* you attacked the resolution, and we are willing, if you wish, to rescind it." (Italics ours.)

What resolution does this refer to? Certainly not the one (1) ratifying and approving the sale to the Imperial Copper Company; nor the one (2) accepting Steinfeld's proposition and authorizing payments to Steinfeld and those from whom he had purchased; nor (3) the payment of commissions. But manifestly all parties had in mind so much of the resolutions as referred to the right of Steinfeld to continue to hold the proceeds of the sale, cash and notes, for his indemnity.

At the stockholders' meeting, the entire 1,000 shares, representing those belonging to Zeckendorf, Steinfeld, Shelton and Curtis, were all voted in favor of the resolution.

We will not stop to recite the other parts of the long finding which includes all the proceedings of this meeting.

At the end of the findings of fact in this connection the Supreme Court of Arizona makes this significant statement:

"In the stockholders' meeting held on the 26th day of December, 1903, hereinabove set out, plaintiff in voting to rescind said agreement of May 20, 1903, and the resolution hereinabove mentioned, did not understand or know or believe that anybody claimed or would claim that the action taken on that day by the stockholders of the Silver Bell Copper Company, would operate to give either Albert Steinfeld or the Mammoth Copper Company any right or claim to any of said proceeds of said sale, *nor did the directors in good faith understand or believe that the stockholders intended to instruct them to rescind any portion of the agreement and resolution other than that relating to the indemnity agreement hereinbefore mentioned.*" (Italics ours.)

It is argued that this is but a conclusion and not in any proper sense a finding of fact. If this be so, we think it is the proper conclusion from the facts stated. In our view it cannot be reasonably maintained that, in passing the resolution, when it is read in the light of the proceedings at the meeting and the known facts surrounding the parties at the time, the stockholders intended to rescind any more of the transaction than related to the indemnity agreement. On the other hand the fair inference from the proceedings at this meeting leaves no doubt in our minds that the stockholders intended to affirm the previous transactions except so far as they related to Steinfeld's right to hold the money and notes for his indemnity, and that Steinfeld acquiesced in such modification as one of the stockholders.

In interpreting the action of the stockholders in passing the resolution, the facts and circumstances surrounding them may legitimately be looked to. *Canal Company* v. *Hill*, 15 Wall. 94, 100, 101. In construing written docu-

ments, "this kind of evidence," said Mr. Justice Bradley, speaking for the court, "is especially pertinent when the inquiry is as to the subject-matter of the agreement" (p. 101). To the same effect, *Reed* v. *Insurance Co.,* 95 U. S. 23, 30, 31.

Notwithstanding the directors did not, in good faith, understand the rescission to go beyond the indemnity feature, as above stated, on December 26, 1903, the directors, Steinfeld, Shelton and Curtis, met and undertook to rescind their former action. It is specifically found that Zeckendorf had no knowledge of this meeting, although it was held on the same day as the meeting of the stockholders to which we have referred. On January 16, 1904, Curtis and Shelton, for the directors, without notice to the other stockholders, and no one else being present but Steinfeld and his counsel, at the request of Steinfeld, adopted the resolution which divided the $515,000, the proceeds of the sale to the Imperial Copper Company, by awarding to Steinfeld and his company, the Mammoth Copper Company, as the owners of one-half of the property sold, one-half of the cash and notes, less certain payments which are recited. Under that supposed authority, Curtis, as treasurer, turned over to Steinfeld $145,743.75 in cash and one of the notes. In so voting and acting it is specifically found that Curtis and Shelton consulted with no person whatsoever except Steinfeld and his attorney and that they were under the complete dominion and control of Steinfeld, and voted and acted on his orders and not otherwise. For the reasons stated, we are of the opinion that the Supreme Court of Arizona erred in affirming so much of the judgment as dismissed the first cause of action. This conclusion renders it unnecessary to consider whether Steinfeld in view of his relation to the company could have held the title acquired by him except in trust for the company.

As to the second cause of action:

On the twentieth of January, 1904, Steinfeld received $33,300 as dividends upon the stock standing in his name as trustee and which is in controversy in the second cause of action, a dividend of $111 per share having been declared by the board of directors. As to this phase of the case, it is unnecessary to recite the facts found by the Supreme Court of Arizona. They are clear and distinct, and there can be no doubt that Steinfeld held the 300 shares of stock purchased from Nielsen for the company, and the court was right in affirming the judgment upon the second cause of action upon the facts found.

It is contended that it was wrong to appoint a receiver in the case, but we think that, in view of the situation of the property and the final winding up of the company, the appointment of the receiver was proper, and that that officer should be continued for the final settlement of the affairs of the company.

It follows that the judgment of the Supreme Court of the Territory of Arizona should be reversed in so far as it affirms the judgment of the District Court on the first cause of action, and affirmed in so far as the Supreme Court affirms the District Court on the second cause of action; and the case remanded to the Supreme Court of the State of Arizona, as successor of the territorial Supreme Court (36 Stat. ch. 310, pp. 557, 576, 577; *Nielsen* v. *Steinfeld*, May 13, 1912, 224 U. S. 534), for such further proceedings as may not be inconsistent with the opinion of this court.

*Judgment accordingly.*