**J. W. PHILLIPS, Appellant,**

v.

**J. V. SANDERS, Appellee.**

No. 3471.

Court of Civil Appeals of Texas.

Eastland.

Oct. 16, 1959.

———◆———

George T. Thomas, Big Spring, for appellant.

Morrison & Caton, Big Spring, for appellee.

GRISSOM, Chief Justice.

J. W. Phillips sued J. V. Sanders for damages for breach of a contract to "root-plow" a part of Sanders' ranch for $10 per acre. At the close of plaintiff's evidence the defendant presented a motion for an instructed verdict, asserting plaintiff had failed to prove the existence of a contract; that he had failed to prove mutual assent and meeting of the minds on the essential terms of the alleged contract, which terms were left for future adjustment. The court sustained the motion, discharged the jury and rendered judgment for defendant. Phillips has appealed.

■ Appellant contends that the making of the contract alleged was made an issue of fact and, therefore, the court erred in rendering judgment for defendant. It is our duty to accept appellant's evidence as true and, viewing it in the light most favorable to him, if from the evidence introduced and inferences that may be drawn therefrom, it can reasonably be concluded that there was a meeting of the minds on all the essentials of a contract, to reverse the judgment.

■ Phillips alleged that in February, 1958, he was engaged in dirt moving and

Sanders owned a ranch; that, through a series of negotiations, they entered into an oral contract for Phillips to root-plow "a certain area" of defendant's ranch, "the exact extent of which area to be plowed was to be determined by exact measurements later to be made by the Soil Conservation Service" but agreed to contain at least 900 acres; that Sanders employed Phillips to do such root-plowing; that Phillips agreed to hold himself in readiness for performance "as soon as the Soil Conservation Service had completed their survey and the exact manner and the extent of the root-plowing to be done"; that Phillips agreed that he would procure all necessary equipment and have it ready "when the time came to begin" such work; that plaintiff was to furnish the machinery, labor, fuel and materials and perform the work "in accordance with the aforementioned plans of the Soil Conservation Service", for which he was to be paid $10 per acre. Phillips alleged he procured additional equipment and held himself in readiness and, from time to time, contacted defendant and the Conservation Service "for the purpose of further familiarizing himself with the matter", so that he could be ready to begin said work "when the time came"; that in March, 1958, he learned defendant had employed another to do the work; that defendant breached the contract and, if Phillips had been permitted to perform the contract, "which under the measurements of the Soil Conservation Service actually consisted of 981 acres", he would have made a profit of $7,310. He sued for $10,000 additional as exemplary damages.

The following is the substance of the testimony introduced, viewed in the light most favorable to Phillips. Plaintiff and defendant had been acquainted for thirty years, during which time Dr. Sanders had been Phillips' family physician, and they were good friends. In the first part of 1958, Phillips was defendant's patient in his hospital. After Phillips was discharged from the hospital he returned to Dr. Sanders once a week for about three weeks for "check ups"; that during these visits there was a discussion concerning root-plowing on Sanders' ranch, which started on the second of his weekly visits for "check ups"; that Dr. Sanders, on the second visit, asked Phillips if he still had his heavy equipment and Phillips told him that he did; that nothing further was then said about any work and when Phillips returned home that day he telephoned the doctor and asked him what he had in mind; that Sanders said he was figuring on root-plowing about 1,000 acres on his ranch in Martin County and wondered if Phillips was interested in the job; that Phillips told him that he "sure would be"; that not much was said in that conversation, but they discussed it at the next office visit, which was a week later. Phillips testified he believed Dr. Sanders figured it up to 980 acres that he had in the tract he was going to have root-plowed; that he believed Sanders asked him at that time about the cost and the price he gave Sanders was $10 per acre; that Dr. Sanders did not make any comment on the price quoted by Phillips. Phillips then was asked whether he then asked Dr. Sanders "if he could do the job, or did he tell you you could do the job or was there anything of that nature stated?" To which Phillips replied, "Well, I believe I told him I'd sure like to have the job. And he said, 'Well, Johnny, I wouldn't think about letting anybody else do it if you would do it'." Phillips testified he thought he told Sanders he would have to buy some equipment; that he didn't then have any root-plowing equipment. He testified they talked about the matter a week later; that on this visit Phillips told Sanders what equipment he would have to buy and what it would cost; that he brought him a clipping out of a newspaper where "they were working out there"; that Sanders told him to go out and look at his ranch; that his purpose in going out to the ranch was to "get an idea of what he had to do". He was asked whether Sanders told him "when he wanted you to begin this root plowing", to which

he answered, "just as soon as that okay came through".

"Q. Did he want the work done immediately upon it coming through?

"A. Oh, yes.

"Q. Did you promise to be ready?

"A. Yes, I told him I'd try to be ready for it."

Phillips testified he went to the Sanders' ranch to get the lay of the land and "see how bad it was"; that he drove up to the ranch house and from there he could see over a lot of land; that he "was pretty well satisfied with it"; that about a month later he learned someone else had the contract. Phillips testified that between the day he went to Sanders' ranch and the time he learned someone else had obtained the contract he went to Dr. Sanders' office two or three times "to talk about the job and get everything lined up"; that, without suggestion from Sanders, he went to Stanton to ascertain whether the Conservation Service had approved Sanders' application, Phillips then testified:

"Q. Outside of the conversation that you had with Dr. Sanders where he told you he wouldn't think of letting anybody else do it but you, did Dr. Sanders at any other time tell you, in those words or other words of similar import, that he would allow or have you to do this work?

"A. Well, I don't know as he come out and said that. I was just taking it for granted that we had already made a trade on the job."

He testified that after this conversation he bought root-plowing equipment for the Sanders' job which he would not have bought if he had not thought he was going to plow Sanders' land; that when he heard Sanders' application had been approved he went to the doctor's office and asked him if he had heard about the approval and "* * * I believe he told me, yes, he had heard that it had gone

through and it was up in the office at Big Spring but he hadn't got a hold of it yet, but said he understood it had gone through." Phillips was then asked whether he asked Dr. Sanders when he was ready for him to start plowing and Sanders replied, "You'd better go up to see my boy on the place." * * * "I think that contract has been let." He was then asked whether he protested the letting of the contract to another and Phillips testified, "Well, I believe I asked him, I says, 'I thought you let the contract on that to me, doc?' and he says, 'Well,' he said, 'we have got to work together,' or something to that effect." He testified that before he left the doctor's office on this occasion Sanders said that if his manager hadn't let the contract to tell him to come down with Phillips to the doctor's house that evening; that he went out to see the ranch manager and was informed that he had let the contract the day before. Phillips testified that he then told said manager that he was under the "impression" he had the job and asked the manager whether Sanders knew about him letting the job to someone else and the manager said that he had told Sanders the night before; that then he went to see Sanders and told him what the manager said and Dr. Sanders said he was sorry it had been let, and that was about all he said.

Plaintiff introduced a portion of the deposition of Dr. Sanders to the effect that he owned a 1,440 acre ranch in Martin County which had about 300 acres in cultivation; that about the first of January, 1958, he started to obtain funds from the Soil Conservation Service for root-plowing a portion of his land; that the government paid about one-half the cost; that he had 1,130 acres root plowed and the government paid $5 per acre and he paid $3. Sanders testified that when Phillips came to see him after the contract had been let he appeared to be "kind of surprised, but grinned over it." Sanders was asked whether Phillips told him then that he thought he had an agreement to do the plowing and had been getting ready for it,

and Sanders answered that Phillips acted "like he thought he had, but I don't think he said so." Dr. Sanders testified that on the occasion when Phillips came to his house, after learning the contract had been let to someone else, Phillips told him his manager said the contract had been let to another and Phillips asked Sanders who made the deals; that Sanders replied they both made deals and he backed up the manager when he thought he was right. Other testimony presented is pertinent only to the amount of damages.

Applying the rule mentioned, we conclude that, despite the apparent meagerness and uncertainty of plaintiff's evidence, it could reasonably be concluded it was agreed that, when the Conservation Service approved Dr. Sanders' application, Phillips would root-plow the number of acres approved in consideration of Sanders' payment of $10 per acre. We believe a question of fact was presented.

The judgment is reversed and the cause is remanded.