473 P.2d 786

**Alfred E. MUCCILLI and Mark Muccilli, Appellants and Cross-Appellees,**

v.

**HUFF'S BOYS' STORE, INC., a corporation, Appellee and Cross-Appellant.**

**No. 1 CA–CIV 1052.**

Court of Appeals of Arizona,
Division 1,
Department B.

Aug. 31, 1970.

Rehearing Denied Sept. 29, 1970.

Review Denied Nov. 10, 1970.

---

586

EUBANK, Presiding Judge.

The plaintiff-appellee Huff's Boys' Store, Inc., a Texas corporation engaged in the business of retailing men's and boys' wear in El Paso, commenced this litigation against Alfred E. Muccilli and Mark Muccilli, father and son, appellants, and F. Gayle Pomeroy and his spouse, to recover for breach of an oral agreement by the three individuals to purchase the corporate business. Trial of the cause ended in a jury verdict in favor of the plaintiff corporation and against all defendants in the amount of $21,000.00. Plaintiff subsequently filed a conditional acceptance of an order of remittitur which reduced its recovery to $15,000.00. The defendants F. Gayle Pomeroy and his spouse have not appealed plaintiff's judgment against them. In their appeal, the Muccillis assert that the evidence failed to show the existence of a joint venture between themselves and Pomeroy to purchase plaintiff's business, or a sufficiently definite purchase agreement, or an ascertainable standard for determining damages. The Muccillis also contend that the facts did not establish grounds for estoppel which would take the oral agreement out of the Statute of Frauds. In a cross appeal, the plaintiff challenged the reduction of its damages to $15,000.00.

We must view the evidence and the inferences to be drawn therefrom in the light most favorable to sustaining the verdict and judgment in favor of the plaintiff. Lane Title and Trust Co. v. Brannan, 103 Ariz. 272, 279, 440 P.2d 105, 112 (1968).

In February 1964, the plaintiff corporation was operating three clothing stores in El Paso, Texas. All three of the stores were located in shopping complexes owned by Given Brothers. James S. Huff was plaintiff's principal owner and officer. Although the corporation had been making a profit, it was faced with a high basic minimum rent and limited capital with which to generate larger volume, and Huff decided to sell.

Lewis & Roca, by John P. Frank, Paul G. Ulrich, John W. Nelson, Sexton & Meier, by Joseph C. Meier, Moeller, Hover, Jensen & Henry, by James Moeller, Phoenix, for appellants and cross-appellees.

Powers, Boutell & Fannin, by Warren C. Ridge, Donald E. Anderson, Phoenix, for appellee and cross-appellant.

One of the persons Huff contacted in this connection was the defendant F. Gayle Pomeroy. Pomeroy, a resident of Mesa, Arizona, was a manufacturer's representative in the clothing business. Previously, he had owned a men's clothing store. Pomeroy told Huff that he and the Muccillis might be interested in purchasing plaintiff's business. The Muccillis were neighbors of Pomeroy in Mesa. Alfred E. Muccilli is a doctor of medicine. He was involved in some financial transactions with Pomeroy, and he had been vice-president of a clothing store corporation headed by Pomeroy. Mark Muccilli, Dr. Muccilli's son, was about 23 years of age in 1964 and was a college graduate with a degree in business administration.

During the last week in February 1964, Pomeroy and Mark Muccilli came to El Paso. By his own statement, Mark Muccilli had in mind purchasing plaintiff's business at this time. He and Pomeroy looked over the stores and inventory and talked to Huff. They indicated that they would probably want to set up a Texas corporation to operate the business. Dr. Muccilli, who was the main financial backer of the group, flew into El Paso on Saturday, February 29. He visited one of plaintiff's stores, and thereafter the four men met at the Sheraton Hotel. At this meeting, Huff stated that he would be willing to retain and sell any merchandise that the prospective purchasers did not want, if he could be assured of receiving his cost for all merchandise that they purchased. This would be secured by a $10,000.00 down payment with the balance due within twelve months. They discussed the approximate size of the sale. Dr. Muccilli indicated that he had the cash to complete the deal and did not want to pay any interest. Huff also initially asked to be paid $2,500.00 for store fixtures.

The four men met again the following morning. They discussed, without disagreement, a price of $1,500.00 for store fixtures. They discussed a "cut off" date of April 5, after which the purchasers would "take over" the business on April 6.

This schedule would give Huff more than 30 days to dispose of merchandise which the purchasers did not want. There was talk of physical separation of the unwanted merchandise. The remaining, unseparated inventory would be purchased at cost, as determined by plaintiff's records. At the end of the meeting, Dr. Muccilli said, "I think we got a deal going here. I would like, before I go [back to Phoenix] [to] finalize this deal. I want to talk to Given Brothers' people * * *".

Huff arranged for the Muccillis and Pomeroy to meet with representatives of Given Brothers. Herbert Given, a vice-president of Given Brothers, testified that Pomeroy stated at this meeting that a deal had been made with Huff. He also testified that an accord was reached as to the amount of rent to be paid over the term of a prospective five year lease. A paper with the pertinent figures on it was signed by Dr. Muccilli and Jack Marcus, secretary of Given Brothers. When Huff saw Pomeroy the next day, Pomeroy indicated that the group had "made a deal" with Given Brothers on the lease, and that "we were all set to go". Pomeroy also indicated on this occasion some merchandise, such as boys' wear lines, that the purchasing group did not want to accept. Two days later, Pomeroy and Mark Muccilli returned and began the separation process. Huff testified as follows:

"We went down—I had racks in the store * * * hundreds of different items, and we went from one to the other. They said, 'We want that, we want this, we don't want that, we don't want this,' just yanking them out and saying 'Here is one they didn't want,' and some cases they said they didn't want to buy."

The separation process and discussion of details and the final make-up of the sale proceeded through the following Saturday, March 6. It had been agreed by this time, if not earlier, that the selling corporation would remain responsible for paying off all of its creditors except Van Heusen & Company, whose latest shipment of goods re-

mained unopened because Mark Muccilli and/or Pomeroy indicated that they wished to merchandise this shipment of goods themselves. The defendants admittedly placed an order with a men's clothing manufacturer in the name of "Mark's Men's Shops". Dr. Muccilli had also given Mark Muccilli a check in the amount of $5,000.00 for a payment to Given Brothers.

, On March 6, Huff met Pomeroy and Mark Muccilli by appointment at the office of the latters' attorney in El Paso. Huff understood that Pomeroy and Mark Muccilli were arranging the organization of a Texas corporation. Huff took a list of his fixtures to give to Pomeroy. Huff did not meet with the attorney, but he stated to Pomeroy:

> "Now, I want to reiterate I have got to have $10,000 down, and I want the balance paid in five months, and $1,500 for the fixtures."

Pomeroy responded, "Yes, you are fine * * * I am accepting this proposal for everybody * * * This is our deal, and, yes, we are going to go into it."

Thereafter, Huff conducted sales of the various merchandise rejected by Pomeroy and Muccilli, and generally conducted plaintiff's business with a view toward closing operations after April 5. Discussions with other prospective purchasers were terminated. Huff talked on the telephone several times with Pomeroy. On each of these occasions, Pomeroy affirmed that the purchase transaction would be consummated as agreed. Huff took a final inventory on April 5, as scheduled, and in accordance with Pomeroy's direction. Huff apparently kept his doors open, but the business was in a "stagnant" state. It was not until late April that Pomeroy told Huff that the deal would not be consummated. We will later refer to certain additional facts.

⬛ Both sides have cited both Arizona and Texas authorities without taking any firm position as to which law applies. We are not advised, however, of any reason why the substantive law of Arizona should

be controlling. All of the negotiations in question took place in Texas, the situs of their subject matter and the place of the contemplated performance. Texas law is clearly applicable. Ross v. Ross, 96 Ariz. 249, 251–252, 393 P.2d 933, 940 (1964); Ruby v. United Sugar Cos., S.A., 56 Ariz. 535, 541, 109 P.2d 845, 848 (1941); Restatement, Conflict of Laws (1934), §§ 311, 332.

⬛ Appellants first contend that the evidence did not show a joint venture between them and Pomeroy. The nature and elements of a joint venture are discussed in North Texas Lumber Co. v. Kaspar, 415 S.W.2d 470 at page 473 (Tex.Civ.App. 1967), as follows:

> "Essential elements of a joint adventure are a community of interest in the undertaking, a right in all parties to the transaction to share in the profits and an obligation on the part of each of them to share the losses. A joint adventure is in the nature of a partnership but is usually limited to a particular transaction or enterprise, and whether the relationship exists generally depends upon the intention of the parties. * * *"

Another element of a joint venture is "a mutual right of the contracting parties to control the enterprise." *Id.*

⬛⬛ As is suggested in W. H. Hodges & Co. of Alexandria v. Donley County State Bank, 399 S.W.2d 193 at 195 (Tex. Civ.App.1966), the test for showing the existence of a joint venture differs somewhat depending upon whether the contest is among the venturers themselves or, on the other hand, with a third person. As a general rule, where the rights of a third party are involved, a joint venture " * * * may be assumed as a reasonable deduction from the acts and declarations of the parties." Rickless v. Temple, 4 Cal.App.3d 869, 84 Cal.Rptr. 828, 844 (1970). It is also a general rule that a party may, by his conduct, estop himself from denying status as a joint venturer and resulting liability. *See* 48 C.J.S. Joint Adventures § 14, page 868.

We think that the jury could find from all of the circumstances here that the two Muccillis and Pomeroy were joint venturers. It was contemplated at first that Mark Muccilli would manage the business, and each of the others had specific contributions to make in the venture. Pomeroy testified in a pretrial deposition that he expected to be a shareholder in the to-be-formed corporation, and the Muccillis' testimony did not contradict that expectation. Pomeroy appeared to act as a principal in the presence of the Muccillis. We are unable to perceive that any essential element could not be logically inferred from the conduct of the parties. Appellants argue at some length that the fact that they intended to create a corporation in the future necessarily negates the existence of a joint venture. But whether or not a joint venture agreement would or would not survive an actual incorporation (which was not shown), we think it clear that a mere intention on the part of the interested parties to carry out some or all aspects of the enterprise through the medium of a corporation is not inconsistent with the present existence of a joint venture. *See* Colonial Refrigerated Transportation, Inc. v. Mitchell, 403 F.2d 541 at pages 545–549 (5 Cir. 1968, applying Texas law).

The evidence being sufficient to submit the issue to the jury, and the jury having necessarily found the existence of a joint venture as the predicate of appellants' liability, it follows that each of the venturers was the agent of the other within the scope of the enterprise. 48 C.J.S. Joint Adventures § 5 c, p. 827; Martin v. Morrison, 260 S.W. 893 (Tex.Civ.App. 1924). "Each of the parties to a joint adventure is legally responsible for the act of the other, performed within the scope of the enterprise and resulting in injury to a third person." 33 Tex.Jur.2d, Joint Adventures, § 9, page 278.

The foregoing narrows the scope of appellants' second major contention, that the agreement was too uncertain or indefinite to be enforceable against them. Pomeroy clearly and unequivocally accepted the offer made by Huff in behalf of plaintiff on March 6, if he had not done so previously. By Huff's testimony, there was nothing further to be negotiated, and the agreement was complete without reduction to writing. The agreement included an ascertainable basis for determining the final total consideration to be paid for the goods transferred. Nothing more than that was required. 1 Corbin on Contracts (1963), § 98. The testimony here is far more definite and substantial that the "meager" and "uncertain" evidence held sufficient to take the existence of a contract to a jury in Phillips v. Sanders, 328 S.W.2d 947 (Tex.Civ.App.1959).

Appellants lay stress on the fact that they had the right under the agreement to reject any goods which they did not wish to purchase. Certainly, as an abstract proposition, a contract which grants what is in effect an *unlimited* option to buy all or nothing cannot be enforced. But here, by a favorable and fair reading of Huff's testimony, Mark Muccilli and Pomeroy had in fact substantially and completely exercised their right of rejection prior to the meeting on March 6. And even if the rejection process had not been completed at that time, so far as the purchasers were concerned, the agreement placed upon them the affirmative duty of rejection, to be exercised prior to the April 5 "cut off" date. By the agreement testified to by Huff, goods not so rejec᾽ ᾽ at least by the cut off date were to be purchased by the defendants.

Appellants argue that there was no sufficient evidence of estoppel to take the oral agreement out of the Statute of Frauds. The issue should never have been in the case, because unlike Arizona, Texas has never adopted that portion of the English Statute of Frauds which prohibits enforcement of an oral contract to convey personal property in excess of a certain value. *See* 26 Tex.Jur.2d, Statute of Frauds, § 11, and Vernon's Texas Civil Statutes, former § 3995, repealed and re-

**590**

placed in 1967 by 4, Vernon's Codes Annotated, Business and Commerce Code (1968), § 26.01. We are in agreement with Professor Corbin's black-letter statement that "Statutes of Frauds however Worded should be Described as Substantive Law", 2 Corbin on Contracts (1950), § 294. *See also* Bernkrant v. Fowler, 55 Cal.2d 588, 12 Cal.Rptr. 266, 360 P.2d 906 (1961). The Arizona Statute of Frauds applies only to Arizona contracts. The contract in question was valid, though oral, under Texas law, and there was accordingly no need to show an estoppel to rely upon the Statute of Frauds.

 This brings us to the question of damages. By the weight of American authority, the *lex loci contractus* is controlling. See Annot., 50 A.L.R.2d 227, § 3, 230–231 (1956). A Texas court has stated that "[t]he universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained." Manney v. Burgess, 346 S.W.2d 937, 939 (Tex.Civ.App.1961). And while a plaintiff has the burden of proving his damages, absolute certainty is not required, as is indicated in the following passage from Southwestern Chemical & Gas Corp. v. Southeastern Pipe Line Co., 369 S.W.2d 489 at page 495 (Tex.Civ.App. 1963):

"The courts draw a distinction in damage suits between uncertainty merely as to the amount and uncertainty as to the fact of legal damages. While uncertainty as to the fact of legal damages is fatal to recovery, uncertainty as to the amount will not defeat recovery. A party who breaks his contract cannot escape liability because it is impossible to state or prove a perfect measure of damages. [Citing other Texas authorities] * *".

 There can be no question here but that the plaintiff corporation was damaged in a substantial way by defendants' breach of contract. The evidence shows that in anticipation of defendants' performance, plaintiff stopped ordering merchandise, liquidated unwanted goods, and generally curtailed its operations to a "stagnant" state When defendants' intention not to perform was finally made clear, contrary to all earlier representations, plaintiff was forced to in effect start all over again and shift its merchandise from one place to another in an attempt to realize the greatest return at the least cost. It was ultimately forced to make an assignment for the benefit of creditors.

Plaintiff produced a certified public accountant who testified that plaintiff sustained an operating loss of $17,300.35 in the period commencing March 1, 1964 (the beginning of plaintiff's fiscal year), and ending October 9, 1964, when the assignment for the benefit of creditors took place. The assignee testified that he valued the inventory turned over to him on October 9 at $14,458.35, and that he was able to sell it under the existing distress conditions for a net salvage to the corporation of $2,760.67, which indicates an additional loss to the corporation of $11,697.68, and a total loss after March 1 of $28,998.03. If a *pro rata* deduction is made from the $17,-300.35 operating loss through October 9 for the period March 1–April 5, the total indicated loss still exceeds the $21,000.00 verdict returned by the jury.

Appellants point to various claimed uncertainties in the proof relating to damages. In one portion of their argument they refer to a statement by Huff that his corporation often or usually lost money in the summer months. But reference to this statement fails to take into account the simple fact that if defendants had performed their agreement, plaintiff would have been out of the business during the summer of 1964. In our view, as an overall matter, plaintiff through its witnesses made a satisfactory *prima facie* case in showing damages. The witnesses could have been cross-examined in detail upon the matters of claimed uncertainty but were not.

 A remittitur is a device for reducing an excessive verdict to the realm of reason. Generally, a remittitur should not be ordered except for "cogent reasons".

See Young Candy & Tobacco Co. v. Montoya, 91 Ariz. 363, 370, 372 P.2d 703, 707 (1962). Here, there is no claim that the jury was instructed ¬y way but properly on the subject of damages. As we have indicated, the jury's verdict was within the limits of the evidence. While we are always reluctant to disturb a discretionary act of the trial judge, we are somewhat less so where, as here, the constitutional fact finder has spoken first upon the specific issue. It might well be that had we sat on the jury, we might have found that a verdict in the amount of $15,000.00 was adequate compensation for the plaintiff. We are unable to find in the record, however, a cogent, logical basis for reducing the figure determined by the jury to $15,000.00. We are accordingly of the view that the verdict of the jury in the amount of $21,000.00 should be reinstated, and that the judgment should accordingly be modified only in that single respect.

We affirm the judgment as modified herein and the trial court is directed to enter judgment reinstating the jury award.

HAIRE and JACOBSON, JJ., concur.