562 P.2d 1080

MODULAR SYSTEMS, INC., an Arizona Corporation, Dale W. Sobek and Jane Doe Sobek, husband and wife, Kenneth Carlson and Jane Doe Carlson, husband and wife, Appellants and Cross-Appellees,

v.

Stan NAISBITT, Appellee and Cross-Appellant,

and

Stuart J. Shoob, Appellee.

No. 1 CA–CIV 3042.

Court of Appeals of Arizona, Division 1, Department C.

Feb. 3, 1977.

Rehearing Denied March 10, 1977.

Review Denied April 5, 1977.

Maxwell P. Keith, Philip S. Keith, San Francisco, Cal., Langerman, Begam, Lewis, Leonard & Marks, P. A. by Barry C. Schneider, Phoenix, for appellants and cross-appellees.

Norling, Rolle, King & Oeser by Richard E. Norling, Kenneth Skiff, Steven H. Williams, Phoenix, for appellees and cross-appellant.

## OPINION

JACOBSON, Presiding Judge.

This appeal is primarily concerned with the validity of a guaranty agreement signed by only one of two guarantors.

The action was initiated by two complaints filed by plaintiffs-appellees, Stan Naisbitt (Naisbitt) and Stewart J. Shoob (Shoob) against defendants-appellants Modular Systems, Inc., an Arizona corporation (Modular), Dale W. Sobek (Sobek) and Kenneth Carlson (Carlson). After consolidation of the two actions and the filing of an amended complaint, the relief sought was the balance due on a promissory note executed by Sobek and Carlson in the original sum of $45,000; the balance due on a loan by Naisbitt to Modular; and breach of a guaranty agreement by Sobek and Carlson as joint venturers.

The appellants, by counterclaim, sought damages for the breach of a Buy-Sell Agreement; fraudulent representation by plaintiffs; tortious interference with Modular; breach of a stockholder's Buy-Sell Agreement; and failure to comply with the Uniform Commercial Code as to disposition of security.

The trial court, by its judgment, resolved these issues by holding that Sobek and Carlson were liable to Naisbitt and Shoob on the promissory note in the sum of $1,942.30, together with attorney's fees; that Sobek and Carlson were joint venturers and both liable under the guaranty agreement in the sum of $26,263.27, together with interest at the rate of 10% per annum, but denied Naisbitt attorney's fees on this agreement; held that Modular was indebted to Naisbitt in the sum of $5,050 for money lent; and denied all relief to appellants on their counterclaims.

Appellants have appealed those portions of the judgment granting relief against them and Naisbitt has cross-appealed from the failure of the trial court to award attorney's fees on the guaranty agreement and to properly allocate attorney's fees on the promissory note count.

The facts giving rise to this litigation are as follows. In January, 1971, Naisbitt, M. Brent Jones, William Goellner and Louis Wulze formed Modular as an Arizona corporation to engage in the business of manufacturing and distributing polyurethane foam panels for the building industry. The original stock issue consisted of Naisbitt purchasing 546 shares of stock (42%) for $27,300; Jones and Goellner each received 312 shares (24% each) for the sum of $15,600 each and Wulze received 130 shares (10%) for $6,500. The stock received by Jones, Goellner and Wulze was actually paid for by Naisbitt who received promissory notes from each in the amount of their respective stock purchases and these individuals pledged their stock to Naisbitt as security for the payment of the notes.

Apparently, the corporation incurred financial losses in its first months of operation which necessitated additional capitalization. This capital was generated by Naisbitt purchasing an additional 200 shares of stock for $10,000 and Shoob, who was attorney for Naisbitt and the corporation, purchasing 100 shares for $7,500. As a result of these purchases, Naisbitt and Shoob controlled the corporation.

Modular continued to have financial difficulties and in July, 1971, Naisbitt contacted Sobek concerning a loan to Modular. Sobek was the president and majority stockholder of Polymir Industries, Inc., which was a supplier of urethane chemicals to Modular.

As a result of this contact, Sobek agreed to loan monies to Modular; however, the loan was rejected by the board of directors of Modular. Naisbitt then offered to sell 50% of the Modular stock to Sobek. Subsequent negotiations ensued, with the end result being that Sobek and Carlson, who was the vice president, accountant and a stockholder in Polymir Industries, agreed to purchase all of Naisbitt's and Shoob's stock in Modular, together with two trucks, for the sum of $65,000. The purchase price was to be paid by $20,000 down, and the balance of $45,000 represented by a promissory note bearing no interest, payable in monthly installments of $5,000 each. The entire transaction was reduced to writing as a Buy-Sell Agreement and it was executed by Sobek, Carlson, Naisbitt and Shoob, together with Jones, Goellner and Wulze. Sobek and Carlson also executed the promissory note. Both the promissory note and the Buy-Sell Agreement provided for attorney's fees in the event of breach.

During these negotiations, and the record is not clear whether this occurred before or after the execution of the Buy-Sell Agreement, discussions were had concerning the stock Naisbitt held as security for the payment of the promissory notes of Jones, Goellner and Wulze, both Sobek and Carlson indicating a desire to obtain this stock in the event default was made on the un-derlying notes. As a result of these discussions, a third instrument entitled "Buy-Sell and Guarantee Agreement"[1] was prepared. This instrument recited that Sobek and Carlson as first parties had acquired stock from Naisbitt as second party; that Naisbitt held 754 shares belonging to Jones, Goellner and Wulze as security for certain promissory notes and that in the event of default on these notes, Naisbitt would become the owner of these shares. This instrument then went on to provide:

"NOW, THEREFORE, Second Party [Naisbitt] agrees to transfer to First Parties [Sobek and Carlson] any and all shares of stock above referred to if he should become the owner of said shares through the default of the three (3) above mentioned individuals; and

"FOR AND IN CONSIDERATION of this Agreement, First Parties agree to personally assume the remaining obligations of the Notes to Second Party existing at the time of default; and, hereby, promise to pay to Second Party the amount or amounts then due and owing at the time of default, and within thirty (30) days thereafter, at which time Second Party agrees to transfer all his right, title and interest to said stock to First Parties."

This agreement was executed by Sobek and Naisbitt, but Carlson did not sign. The agreement was subsequently submitted to Carlson for signature, and he, through interlineation, changed the agreement from a guaranty agreement to a first refusal option to buy. When returning the agreement to Sobek he attached a note which provided:

"Attached is the revised agreement on the option to buy stock, which as I understand was the original intention. This option as noted in the agreement comes about through the premium we paid over book value to Stan [Naisbitt] for Stan's interest.

"Returned originals unsigned.

"s/ Ken
"K. Carlson"

---

1. Appellants before this court have characterized the nature of this instrument as a straight guaranty agreement. We have treated it in this posture for the purposes of this appeal.

As a result of Carlson's refusal to sign the agreement, Sobek prepared a new option agreement and forwarded it to Naisbitt and Shoob. No response was forthcoming on this agreement and apparently nothing further was done by the parties.

Sobek and Carlson continued to make all payments under the $45,000 promissory note, except the last payment. During this interval, alleged debts of Modular not listed in the Buy-Sell Agreement came to light as a result of which a dispute arose between the parties as to the balance due on the last payment under the note.

Also, on December 1, 1971, Goellner defaulted on his promissory note to Naisbitt which was secured by 312 shares of Modular stock. Through negotiations between Naisbitt's attorney and Goellner's attorney, Naisbitt accepted the 312 shares in satisfaction of Goellner's obligation with a 60-day provision for Goellner to reacquire the stock in the event Goellner made up all past payments. Sobek and Carlson were not advised of these arrangements. In Naisbitt's first verified complaint in this matter, he alleged he was the owner of 312 shares of Modular stock. This was Goellner's pledged stock.

Likewise, in December, 1972, Jones defaulted on his promissory note to Naisbitt.

Shortly after the sale of stock to Sobek and Carlson, Naisbitt hired two allegedly key employees of Modular. This hiring together with the unknown indebtedness of Modular gave rise to the bulk of Modular's counterclaims.

### Guaranty Agreement

■ Appellants first contend that the "Buy-Sell and Guarantee Agreement" executed by only Sobek and Naisbitt and not containing the signature of Carlson is invalid. Appellees counter this argument by contending that the burden of proving that the document was "conditionally" delivered was on appellants and their failure to sustain this burden results in a binding agreement. In our opinion, appellees' argument on conditional delivery is misplaced. This document on its face is incomplete—the absence of execution by a party sought to be bound thereby. The general rule is where an instrument has been executed by only a portion of the parties purported to be bound thereby, the instrument is incomplete and never takes effect as a valid contract even against those who have executed it. *Anthony Macaroni Co. v. Nunziato*, 5 Cal. App.2d 588, 43 P.2d 315 (1935); *Palman v. Reynolds*, 310 Mich. 35, 16 N.W.2d 657 (1944); 1 Williston, Contracts §§ 28A, 67 (1936).

The exception to this rule is where all the parties, including non-signers, by their actions recognize the validity of the agreement and acquiesce in its performance. See *Doman Hunting & Fishing Association v. Doman*, 159 Kan. 439, 155 P.2d 438 (1945). Here, Carlson, at least, did not acquiesce in the performance of the agreement and, in fact, refused to execute it because in his opinion it did not purport to be the understanding of the parties.

Thus, we do not have the issue of a conditional delivery of this instrument, but rather the question of whether or not the agreement was binding at all. Naisbitt bore the burden of persuasion on this issue. The trial court obviously recognized this burden and the general principle of law applicable here by finding the agreement binding only because of the existence of a joint venture between Sobek and Carlson, thereby making Sobek's execution on behalf of the joint venture binding on Carlson. We turn then to this issue.

Naisbitt contends that a joint venture existed between Sobek and Carlson solely on the authority of this court's decision in *Muccilli v. Huff's Boys' Store, Inc.*, 12 Ariz. App. 584, 473 P.2d 786 (1970). Such reliance is misplaced.

In *Muccilli*, three individuals intended to purchase the fixtures and inventory of a clothing store in El Paso, Texas. The negotiations for the purchase were conducted by one of the individuals as principal on behalf and in the presence of the other parties. As a result of these negotiations, a sale and

its terms were agreed upon and the principal negotiator advised the seller that he was accepting the deal on behalf of his co-buyers. In reliance upon that representation, the seller disposed of portions of his inventory (not wanted by the buyers) at a loss and in essence brought his business to a standstill pending the closing of the sale. The buyer subsequently refused to go through with the transaction. One of the buyers, not the principal negotiator, defended the breach of sale action on the ground that he had not personally agreed to the terms of the sale. This court, on appeal, observed that it was the "general rule that a party may, by his conduct, estop himself from denying status as a joint venturer and resulting liability." *Id.* at 588, 473 P.2d at 790.

This court then held that based upon the conduct of this buyer and the resulting reliance by the seller on this conduct to his damage, a jury issue was raised as to the existence of a joint venture between the buyers, even though they contemplated forming a corporation to run the business.

Here, there is no contention that Carlson by his conduct led anyone to believe that Sobek's action in executing the guaranty agreement would be binding on him. In fact, the evidence would indicate that the idea of obtaining the pledged stock was Carlson's and that it was his approval of the agreement to carry out this intention that was important. Moreover, there is no evidence that Naisbitt in any manner relied upon the legal binding effect of the guaranty agreement to his detriment. Again, the evidence is to the contrary. The guaranty agreement was completely collateral and separate from the original Buy-Sell Agreement whereby Sobek and Carlson obtained the stock of Naisbitt and Shoob. Also, rather than relying on this guaranty agreement, Naisbitt's actions would appear to be in conformity with the nonexistence of the agreement. Upon Goellner's default, he acquired this stock in his own name and subsequently sued, alleging he was the owner of this stock. Apparently, Naisbitt never notified Sobek and Carlson of the default of

Goellner and Jones and made no demand upon them for payment under the agreement until an amended complaint was filed in this matter, some three and one-half years after Goellner's default.

■ In short, the simple acquisition by Sobek and Carlson of equal shares in Modular does not give rise to an agreement to share equally in the losses and profits of Modular, an essential element of a joint venturer agreement. *Ellingson v. Sloan*, 22 Ariz.App. 383, 527 P.2d 1100 (1974). Moreover, there is no evidence that would justify the finding of a joint venture under the principles of estoppel.

■ We therefore hold that the guaranty agreement never became an effective binding agreement and consequently, the trial court's judgment based upon this agreement must be reversed.

By this holding, we also dispose of Naisbitt's contention on the cross appeal that he is entitled to attorney's fees against Sobek and Carlson on breach of this guaranty agreement.

*Balance Due on Promissory Note*

The trial court found that Sobek and Carlson owed an additional $1,942.30 on the original promissory note in the sum of $45,-000. Appellants allege that they are entitled to additional setoffs on this indebtedness of $3,050 representing uncollectible receivables of Modular because of defective merchandise sold by Modular prior to the date of the Buy-Sell Agreement.

■ The pertinent portion of the Buy-Sell Agreement giving rise to this claim of setoff provides: "that if the *liabilities* of the corporation" exceeded a stated amount, then Sobek and Carlson were entitled to a credit on the last $5,000 payment due on the promissory note. Appellants contend that they were improperly excluded from offering oral testimony that the terms "liabilities of the corporation" was intended by the parties to include setoffs by buyers of Modular's products for defective merchandise— in essence a warranty of accounts receivable. Such evidence would clearly be in vio-

lation of the Parol Evidence Rule and was therefore properly excluded by the trial court. *Hofmann Co. v. Meisner,* 17 Ariz. App. 263, 497 P.2d 83 (1972).

This also disposes of appellants' contention that a counterclaim embracing this $3,050 was improperly dismissed by the trial court.

### Counterclaim Dismissals

 Appellants also urge that various counterclaims dealing with fraudulent misrepresentations, tortious interference by Naisbitt in Modular's operations, malicious prosecution and breach of stockholder's agreements were improperly dismissed. Appellants' opening brief, however, failed to state with any particularity why or how the trial court erred in making these rulings and simply concludes that error was committed. In our opinion, this is the same as not arguing an issue raised on appeal and under well-recognized principles of appellate review, these issues are deemed abandoned. *Kadish v. Phx-Scotts. Sports Company,* 11 Ariz.App. 575, 466 P.2d 794 (1970); *Brockmueller v. State,* 86 Ariz. 82, 340 P.2d 992 (1959).

### Cross-Appeal

By his cross-appeal, Naisbitt contends that the trial court improperly allocated attorney's fees between prosecution and defense of the promissory note (which by its terms provided for attorney's fees) and the prosecution and defense of the guaranty agreement (which we have held not binding).

We note that the trial court found the sum of only $1,942.30 was due on the promissory note. We also note that the trial court awarded attorney's fees in excess of $600 on this note (approximately one-third of the amount of recovery). We also note that at the time of trial, Naisbitt made no effort to segregate the amount of legal services to the various counts of its complaint. Under these circumstances, we find no abuse of discretion in the award of attorney's fees made by the trial court. *Zeckendorf v. Steinfield,* 12 Ariz. 245, 100 P. 784 (1909), *modified,* 225 U.S. 445, 32 S.Ct. 728, 56 L.Ed. 1156 (1912).

For the foregoing reasons, the judgment of the trial court, awarding Naisbitt $26,-262.37 under the guaranty agreement is reversed and the matter is remanded with directions to enter judgment in favor of Sobek and Carlson on this issue. In all other respects, the judgment of the trial court is affirmed.

HAIRE and WREN, JJ., concur.