480 P.2d 680

Samuel Burr LOGAN and Helen Logan, husband and wife, doing business as Logan Drilling Company, Appellants,

v.

The O. S. STAPLEY COMPANY, an Arizona corporation, Appellee.

No. 1 CA–CIV 1087.

Court of Appeals of Arizona,
Division 1,
Department B.

Feb. 17, 1971.

Rehearing Denied March 19, 1971.

Review Denied April 13, 1971.

Minne & Sorenson, by George Sorenson, John W. Rood, Phoenix, for appellants.

Jennings, Strouss & Salmon, by Charles E. Jones, Phoenix, for appellee.

EUBANK, Judge.

This appeal involves questions arising from the proof of a written chattel lease contract[1] between lessee-appellant, Samuel Burr Logan, hereafter called "Logan" and the lessor-appellee, The O. S. Stapley Company, hereafter called "Stapley", and the proof of the agency relationship and authority of Ed Hallmark to execute the lease contract on behalf of Logan with Stapley. The trial court, sitting without a jury, ruled in effect that the agency relationship was proven, as were the damages, and awarded Stapley judgment in the sum of $1700, together with interest and costs. Logan appeals from that judgment.

In 1967 this case was before this Court to review the trial court's involuntary dismissal of Stapley's case pursuant to Rule 41(b), Rules of Civil Procedure, 16 A.R.S. See O. S. Stapley Co. v. Logan, 6 Ariz.App. 269, 431 P.2d 910 (1967). We reversed the trial court and remanded the case for trial because our review of the record revealed that Stapley had established a prima facie case that Logan had clothed Ed Hallmark with apparent or os-

1. Modern Treatment of Common Law Bailment. Williston on Contracts, 3rd Ed. § 1041A (1967).

tensible authority to execute the contract with Stapley on his behalf. On remand to the trial court, the case was retried in early 1969 without a jury. Neither party requested findings of fact and conclusions of law and none were made by the court. Under such circumstances we are required by law to draw all inferences which arise from the evidence in favor of sustaining the judgment. Rosen v. Hadden, 81 Ariz. 194, 303 P.2d 267 (1956); Kay v. Biggs, 13 Ariz.App. 172, 475 P.2d 1 (1970).

Logan raises five questions on appeal as follows:

1. Did plaintiff prove a breach of contract?

2. Did plaintiff establish any damages as the result of the alleged breach of contract?

3. What was the authority of Ebert, if any, to execute credit statements?

4. Was the conduct of defendants with respect to Hallmark and Ebert such as to establish the business left in the hands of agents?

5. Did defendants ratify the actions of Ebert and Hallmark?

The first two questions relate to the lease contract, while the last three questions involve the proof of the agency relationship. We will discuss the related questions in the same context.

## THE LEASE CONTRACT

The contract in this matter consists of a written document drawn in the form of a lease wherein Stapley is designated the "lessor" and Logan Drilling Co. is described the "lessee". The "Equipment Leased" or bailed consisted of construction equipment, generally, one International Tractor, one Wagner Backhoe, and one Wagner Loader. The term of the lease was for a 6-month period with the "lessee" granted the option to purchase the leased

2. Neither party contends that this option feature of the lease converted the bailment contract into a conditional sales agreement or otherwise affects Stapley's

equipment.[2] The lease was executed by Ed Hallmark on behalf of Logan Drilling Co. on February 14, 1962, and by John C. Dutton on behalf of Stapley on February 20, 1962. It provided that possession of the leased equipment was delivered to the lessee conditioned upon the payment to the lessor of $550 plus tax ($19.25) each month for the 6-month term of the lease. The first payment in the sum of $569.25 was received from Logan Drilling Co. by lessor on February 17, 1962, and the second and last payment was received from the lessee on May 5, 1962. The leased equipment was returned to Stapley one month early, on July 1, 1962, and the instant case was filed for the recovery of three months "rent" or $1700 (rounded off). The lease provides in part:

11. In the event the lessee accepts the machinery and equipment, as herein provided, and thereafter the said machinery proves defective or unfit for use, because of accident or otherwise, or, if for any other reason lessee desires to discontinue the use of said machinery or equipment, the only remedy of lessee shall be to return the machinery to lessor and terminate this contract as herein elsewhere provided, by paying all rental charges and other charges herein provided for, which in no event shall be less than the transportation charges on said machinery and equipment and minimum rental herein provided for.

\*   \*   \*   \*   \*   \*

21. The lessee agrees to pay all rentals when they are due and for all services and materials furnished and all damages and sums due the lessor under this contract as soon as the loss occurs or services are rendered or materials are furnished. The taking of notes, or renewals thereof, covering rentals herein specified shall not in any manner whatsoever change or invalidate the terms and conditions of this contract.

title. See Williston on Contracts, 3rd Ed. § 1041A, p. 927 (1967); 8 Am.Jur. 2d, Bailment, § 28, pp. 934-935.

\* \* \* \* \* \*

25. This lease before becoming effective must be approved by an officer of the lessor, at the home office of the lessor.

█ Logan first questions whether a breach of the lease contract was proven. As we have seen, the contract specifically called for the payment of a specified rent to the lessor each month and the lessee undertook to pay this obligation as it accrued. (Par. 21). The record shows that three payments were not made before the leased equipment was returned on July 1 (Par. 11). By the express terms of Paragraph 21 of the contract, upon the non-payment of rent a breach occurred. Ogonowski v. Bankers Leasing Corp., 8 Ariz.App. 484, 447 P.2d 576 (1968); 8 Am.Jur.2d, Bailment, § 127, p. 1021.

█ Logan next contends that Stapley failed to prove its damages. The record does not support this contention. The lease provides that all rentals were due monthly in advance and payable at Stapley's office in Phoenix. It further provided that the lease would become effective upon approval of an officer of Stapley. This approval occurred on February 20, 1962, when Mr. John C. Dutton executed the lease on behalf of Stapley. The monthly rental cycle, as we see it, began on February 20, 1962. The first monthly payment made by the lessee was for the first month's period, February 20 to March 19; the second and last payment, made in May, was for the next monthly rental period then due—March 20 to April 19. No other payments were made by Logan and the leased equipment was returned to Stapley on July 1, 1962. Under the express terms of the lease, three payments in the sum of $569.25 were due at the time the equipment was returned—the payments for April 20, May 20, and June 20, or $1700 (rounded). Paragraph 11 of the lease, supra, provides for the July 1st termination of the lease by the return of the equipment conditioned upon " \* \* \* [Logan] paying all rental charges and other charges

herein provided for. \* \* \*" One of these charges is for the minimum rental period which is defined on the face of the lease as a " \* \* \* a minimum period of 6 months. \* \* \*" However, Stapley limited its prayer in the complaint and its proof of damages to a 5-month period because of the clear language of Paragraph 11 of the lease dealing with termination of the lease upon redelivery of the equipment. We hold that the trial court applied the proper measure of damages under the circumstances of this case and that the record supports the trial court's determination of damages. See 9 Williston on Contracts, § 1041, p. 925 (3rd Ed.1967); 8 Am.Jur.2d, Bailments, § 330, p. 1217.

## THE AGENCY RELATIONSHIP

Logan's last three questions on appeal question the sufficiency of the proof of the agency relationship between Logan and his office manager Ebert, and Hallmark, who executed the lease on behalf of Logan. In our prior opinion, O. S. Stapley Co. v. Logan, supra, we set out in some detail the evidence that made out a prima facie case for the plaintiff Stapley. We said at p. 273 of 6 Ariz.App. at p. 914 of 431 P.2d:

\* \* \* Logan, albeit due to his illness, had allowed his business to continue in the hands of his employees. His absence from the business was to be for some period of time. From his actions of delegating authority to Ebert and expecting him, as office manager, to carry on the normal business of the Logan Drilling Company, can be implied the authority to Ebert and Hallmark to enter into the contract with Stapley.

We agree with Logan that our prior opinion is not res judicata insofar as the case at bar is concerned because we expressly remanded the case for a new trial and limited our opinion to the sufficiency of Stapley's evidence only. However the facts in the prior case were fully re-established in this case and in order to avoid unnecessary reiteration and conserve time and space the factual statements contained

in O. S. Stapley Co. v. Logan, supra, are incorporated herein.

In addition to the evidence described in our first opinion, the second trial produced additional substantive evidence that Hallmark had implied authority to execute the lease on behalf of Logan. The evidence shows that Logan filed an affidavit executed by him under oath with the Registrar of Contractors on April 24, 1962, under No. PA–6205 which described his business, his accident in 1961, and his business relationship with Hallmark in February 1962, the time that the lease was executed on his behalf. In part, the affidavit states:

> * * * Affiant then, in February, 1962, entered into an agreement with Ed Hallmark, dba Hallmark Construction Co., possessor of a Class A license, so that Hallmark became managing employee. Application was made on behalf of Logan Drilling Co. for an A–12 license, after Hallmark had talked to the Registrar as to what the proper procedure was for application. Neither Affiant nor Hallmark was aware of nor were they advised of anything standing in the way of the issuance of the A–12 license, and both concluded, after the application and bond were filed, and the fee was paid on March 15, 1962, that the license would be forthcoming in a day or so, as had been their previous experience.

> Affiant is informed and believes that the license number entered upon bid forms both at Prescott and Flagstaff was the new license number, which was giveen (sic) to Hallmark over the telephone by an employee of Logan Drilling Company, who simultaneously received the number from an employee of the Registrar's office.

> That both affiant and his managing employee acted upon an honest mistake of fact, and did not knowingly exceed the limitations of their licenses in all their conduct.

On the basis of Logan's affidavit the Registrar of Contractors, after consolidat-

ing for hearing three separate complaints, issued its "Decision and Order" on June 6, 1962, holding that Ed Hallmark, doing business as Hallmark Construction Co., " * * * did act as agent, partner, association or otherwise as an unlicensed person, namely Logan Drilling Company. However, such acts were not done with intent to evade the provisions of the contractors licensing law." The complaint was then ordered dismissed.

In addition, the evidence showed that Logan extended his contractor's bond to cover the construction job that was the source of the complaint and that Stapley's equipment was used on the job. Logan testified that Hallmark left in June 1962, after the job was completed. The leased equipment was returned on July 1. Further, the two payments made to Stapley were made by checks drawn on the Logan Drilling Co. account, by the office manager, Ebert, who was authorized to make such checks.

Historically, the law of agency has recognized a broad implied authority in a manager to lease, purchase, or sell chattel which is used within the scope of the business that the agent is authorized to manage for the benefit of the principal. Mechem, Agency, 2nd Ed. §§ 979, 980, 981, pp. 706–708 (1914). The recognition of this rule has continued down to the present and is included within the Restatement of Agency, 2d, § 73, P. 189 (1958) in part as follows:

> Unless otherwise agreed, authority to manage a business includes authority:

> (a) to make contracts which are incidental to such business, are usually made in it, or are reasonably necessary in conducting it;

> (b) to procure equipment and supplies and to make repairs reasonably necessary for the proper conduct of the business;

Our Supreme Court reached the same conclusion in Lois Grunow Memorial Clinic v. Davis, 49 Ariz. 277, 66 P.2d 238 (1937),

placing emphasis on "ordinary course of business" as the limiting factor. Certainly, as in the instant case, the managing employee of a construction company would have the implied authority to lease construction equipment for a particular job to be undertaken in the name of the principal. This was within the ordinary course of Logan's business.

■ It should be said that appellant took the stand, testified, and that he was impeached on several occasions. Under such circumstances the trier-of-fact would be justified in giving little or no weight to his testimony. Udall, Arizona Law of Evidence, § 63, p. 92 (1960); McCormick, Law on Evidence, § 39, p. 74.

■ Drawing all inferences arising from the evidence in favor of sustaining the judgment, we have no difficulty in holding that the judgment is supported by the evidence. The record supports the trial court's determination, in effect, that Stapley proved that an actual agency by implication existed between Hallmark and Logan whereby Hallmark, as managing employee, had the implied authority to execute the lease contract with Stapley, on behalf of Logan, in order to obtain construction equipment to be used within the scope and course of Logan's business.

Our conclusion makes it unnecessary to answer the specific last three questions raised on appeal because if Hallmark was Logan's managing employee with authority to execute the lease, as we have held, Logan is bound by the contract irrespective of Ebert's authority to give Stapley the credit statement. Further, the question of ratification of the agency relationship is resolved by our holding and need not be discussed.

The judgment is affirmed.

JACOBSON, P. J., and HAIRE, J., concur.