539 P.2d 978

**TIFFANY CONSTRUCTION COMPANY, and Fireman's Fund Insurance Company, Appellants,**

**v.**

**HANCOCK & KELLEY CONSTRUCTION COMPANY, an Arizona Corporation, and John Kissinger, dba B & K Construction, Appellees.**

**HANCOCK & KELLEY CONSTRUCTION COMPANY, an Arizona Corporation, Cross-Appellant,**

**v.**

**John KISSINGER, dba B & K Construction, Tiffany Construction Company, and Fireman's Fund Insurance Company, Cross-Appellees.**

**No. 1 CA–CIV 2508.**

Court of Appeals of Arizona,
Division 1,
Department B.

Sept. 11, 1975.

Rehearing Denied Oct. 22, 1975.
Review Denied Dec. 9, 1975.

Cunningham, Goodson & Tiffany, Ltd. by James P. Cunningham, Phoenix, for appellants.

Jennings, Strouss & Salmon by William F. Haug, M. Byron Lewis, Phoenix, and William C. Kennedy, Kingman, for appellees.

OPINION

JACOBSON, Presiding Judge.

This appeal presents the interesting question of whether a supplier of materials should be classified as a materialman or a subcontractor.

This question arose out of two separate actions instituted by appellees-cross-appellants, Hancock and Kelley Construction Co. (Hancock & Kelley) and Diversified Petroleum Products, Inc. (Diversified) against appellant-cross-appellees, Tiffany Construction Company (Tiffany) its bonding company, Fireman's Fund Insurance Co. and John Kissinger dba B & K Construction (Kissinger). The two separate actions were consolidated for trial purposes, and, after intermediate procedural orders not pertinent to the issues presented here, the trial court entered judgments generally in favor of the appellees and against Tiffany. The exact effect of these judgments will be set forth later in this opinion.

The operative facts giving rise to this litigation are as follows. On June 28, 1968, the Arizona State Highway Department awarded a contract to Tiffany for the seal coating of several miles of state highway known as the Davis Dam-Kingman Highway Project, located in Mohave County, Arizona. Fireman's Fund posted the labor, material and performance bond for this project.

The seal coating operation required the application of rock chips to the existing bituminous highway surface with a sealer. The chips themselves (called type C chips) had to meet specific state specifications and were subject to rejection by the state if these specifications were not met. Type C chips do not occur in nature and are produced in a crushing operation. Moreover, these chips must be manufactured on a job-by-job basis and normally cannot be stockpiled for any length of time as they will "go out of specs".

After Tiffany had obtained the contract with the state, it originally contracted with WMK Materials Company to supply type C chips but a default was occasioned by this supplier.[1] At the time of the WMK default, Kissinger was employed by that company and through this employment learned of Tiffany's need for type C chips. After learning that WMK was terminating its contract with Tiffany, Kissinger and a fellow employee named Dean Belding decided to form a partnership known as B & K Construction Co., leave the employment of WMK and contact Tiffany and see if they could obtain the contract to supply type C chips. Tiffany was contacted by Kissinger on July 25, 1968 and informed that Kissinger was interested in producing the chips, that they had the equipment available to handle the job and quoted a price per ton for type C chips. In fact, at that time, Kissinger had no equipment for this job except some hand tools and a truck. Moreover, Kissinger was not a licensed contractor in the State of Arizona.

As a result of this initial contact, Tiffany entered into a written contract with Kissinger whereby Kissinger agreed to supply Tiffany with 3,100 tons of chips at $6.00 per ton and guaranteed that these chips would meet state highway specifications. It was apparently contemplated that Kissinger could produce the desired tonnage of chips in time to allow Tiffany to complete its contract by the completion date of August 19, 1968.

After obtaining the contract with Tiffany, Kissinger made arrangements with Hancock & Kelley to rent the crusher needed to produce the chips. The terms of the rental agreement were that Kissinger would pay Hancock & Kelley a rental on the basis of 30 days or 3,100 tons of chips at $1.00 per ton, for a total rental of $3,100.00. Before Kissinger started the crushing operation, it contacted Diversified to secure the necessary gas, oil, grease and diesel fuel to conduct the crushing opera-

1. The litigation arising out of this default is reported in *Tiffany Incorporated v. WMK* *Transit Mix, Inc.*, 16 Ariz.App. 415, 493 P. 2d 1220 (1972).

tion. Diversified agreed to supply these materials to Kissinger on credit.

The materials necessary to produce the chips were to be obtained from a material pit owned by the State of Arizona. Tiffany had obtained permission from the state to use this pit at a no royalty cost.

Apparently Kissinger moved onto the job site around August 1, 1968, but after three weeks, the State Highway Inspector informed Tiffany by letter that "To date your cover material producer has not produced any material which complies with specification." By the end of August Kissinger had produced no more than 800 tons of usable chips.

Because of the job completion date of August 19, 1968 and a penalty clause for delay in completion, Mr. Herb Tiffany, president of Tiffany, determined he had three alternatives, insofar as Kissinger's production was concerned: (1) allow Kissinger to continue as he had been doing, (2) send up another crusher and equipment and keep Kissinger on to assist in production, or (3) terminate Kissinger and perform the job itself. Tiffany decided the second alternative was the most economical.

As a result of this decision, on September 4, 1968, Tiffany sent a second crusher to the job site which was immediately put into operation. It appears that the Hancock and Kelley crusher was used on only one occasion after this date. In addition to the crusher supplied by Tiffany, three additional men were supplied who were paid directly by Tiffany. Tiffany, after September 4, 1968, considered its contract with Kissinger as being breached, that Kissinger was in effect job superintendent for Tiffany and that Tiffany was supplying its own type C chips. Kissinger did not return the Hancock & Kelley crusher until the job was finally completed on October 19, 1968.

Although the record in this regard is in dispute, Tiffany contends it did not know of the existence of Hancock & Kelley or Diversified until some months after the contract was completed.

Tiffany paid Kissinger $8,095.00 for his part performance of the contract. Kissinger in turn did not pay Hancock & Kelley or Diversified.

As the result of the litigation initiated by Hancock & Kelley and Diversified, the following legal stances were assumed by the various parties:

(1) Hancock & Kelley and Diversified sought payment of their respective claims against Kissinger on express contract and against Tiffany and Fireman's Fund on two alternative theories: First, that Kissinger was a subcontractor of Tiffany and by reason of the language contained in the Fireman's Fund bond,[2] Tiffany and its bonding company were liable for Kissinger's bills.

Second, they maintained that a joint venture relationship existed between Kissinger and Tiffany, making Tiffany liable for their claims. Plaintiffs also sought attorney's fees under the provisions of the bond.

(2) Tiffany cross-claimed against Kissinger, claiming Kissinger breached its contract with Tiffany. Moreover, Tiffany sought indemnity against Kissinger for any liability it might have against Hancock & Kelley and Diversified.

(3) Kissinger in turn cross-claimed against Tiffany likewise claiming a breach of their contract and seeking full payment thereunder.

The trial court's judgment resolved these claims as follows. As to the claims of Hancock & Kelley and Diversified, it held Kissinger liable for the total amount of these claims. As to Tiffany, the trial court found it had no liability on these claims for rental or fuel supplied prior to

---

2. The bond contract provided that the principal would promptly pay " . . . all laborers, mechanics, sub-contractors and material men and all persons who supply such laborers, mechanics, or subcontractors with material, supplies or provisions . . . ."

September 4, 1968. However, on that date the trial court found that Tiffany and Kissinger became "joint venturers" in the production of the type C chips and thus were jointly liable for rental and fuel supplied after this date. Moreover, the trial court found Tiffany and Fireman's Fund liable for $1,500 in attorney's fees but allowed interest on the total of these claims from the date of judgment only.

As to the Tiffany-Kissinger dispute, the trial court found that Kissinger had not breached its contract with Tiffany and therefore dismissed Tiffany's cross-claim against Kissinger. However, the trial court did find that Tiffany had wrongfully interfered with Kissinger's contract and therefore Tiffany was liable to Kissinger for the balance of the contract price.

Tiffany and Fireman's Fund have appealed those portions of the judgment denying Tiffany's cross-claim against Kissinger, the Kissinger judgment against Tiffany and the Hancock & Kelley and Diversified judgment entered against Tiffany and Fireman's Fund. Hancock & Kelley and Diversified have cross-appealed from that portion of the judgment denying the total of its claim against Tiffany and Fireman's Fund and denying interest on their claim from the date their respective bills became due. Hancock & Kelley also contend the trial court miscalculated the amount due it by omitting $300 as rental for a generator. These cross-appellants also seek attorney's fees on appeal.

Kissinger filed no appeals nor did it make any appearance in this court in opposition to the appeal or the cross-appeals.

### TIFFANY–KISSINGER CONTROVERSY

■ Turning first to that portion of Tiffany's appeal dealing with its cross-claim against Kissinger and Kissinger's judgment against it, we find that Tiffany has raised justiciable issues as to the correctness of the trial court's judgment in these regards. As indicated, Kissinger has not responded to these justiciable claims and in the opinion of this court such a failure constitutes a confession of reversible error. *Cottonwood v. Evans,* 13 Ariz. App. 595, 480 P.2d 16 (1971). Therefore, that portion of the trial court's judgment granting judgment to Kissinger against Tiffany in the sum of $13,020.90 plus costs is reversed and the cross-claim of Kissinger against Tiffany is dismissed. Moreover, that portion of the trial court's judgment dismissing Tiffany's cross-claim against Kissinger is reversed and the trial court is directed to enter judgment in favor of Tiffany and against Kissinger in the sum of $5,750.93 together with Tiffany's costs incurred.

■ We apply the same reasoning to that portion of Hancock & Kelley's claim against Kissinger in the sum of $300 representing rental for a generator. Therefore, the judgment of Hancock & Kelley against Kissinger is amended by adding thereto the sum of $300.00.

### TIFFANY–HANCOCK & KELLEY AND DIVERSIFIED CONTROVERSY

The judgment entered in favor of Hancock & Kelley and Diversified (cross-appellants) against Tiffany has been attacked on two fronts. The attack by Tiffany centers on the sufficiency of the evidence to justify the finding by the trial court that Tiffany and Kissinger became joint venturers on September 4, 1968, thus subjecting Tiffany to liability for debts incurred after that date. The attack by cross-appellants centers on the failure of the trial court to find that Kissinger's status to the road project was that of a subcontractor, thus subjecting Tiffany and its bonding company to liability for materials supplied such a subcontractor in accordance with the bonding provisions. We will deal with the joint venture issue first.

We first note that the trial court's finding that Tiffany wrongfully interfered with Kissinger's contract by taking control of the job on September 4, 1968, thus subjecting Tiffany to liability to Kissinger, is

somewhat inconsistent with its finding that a joint venture relationship was established between Tiffany and Kissinger on that date. Moreover, the finding of the existence of a joint venture is inconsistent with the cross-claims asserted by the alleged joint venturers against each other, that is, breach of contractual obligations existing between them.

■■ Normally, a joint venture arises out of a contractual agreement between the parties having as its essential elements, "a community of interest in the undertaking, a right in all parties to the transactions to share in the profits and an obligation on the part of each of them to share the losses." *Muccilli v. Huff's Boys' Store, Inc.,* 12 Ariz.App. 584, 588, 473 P.2d 786, 790 (1970). Generally, whether the relationship of joint venturers exists depends upon the intention of the parties. *Muccilli v. Huff's Boys' Store, Inc., supra.* Here, we are unable to find any evidence that Tiffany and Kissinger intended after September 4, 1968, that the production of type C chips was to be a joint venture. In fact, the only evidence presented was that after September 4, 1968, Tiffany considered Kissinger to be acting in the capacity of job superintendent as an employee of Tiffany. Cross-appellants point to evidence that Kissinger was in complete control of the job site after September 4, with the power to fire and hire personnel placed on the job by Tiffany. While such evidence exists, the power to control and hire and fire does not give rise to ᵥ any inference that an agreement to share profits and losses exists. Likewise, this evidence is consistent with Tiffany's assertion that Kissinger was "job superintendent"—a position normally embracing the right to control operation and personnel. We therefore conclude that as between Tiffany and Kissinger themselves there is no evidence which would establish a relationship of joint venturers.

■ This does not mean, however, that as to cross-appellants such a relationship could not be said to exist. However, in the absence of a joint venture agreement, either express or implied, elements of estoppel must be shown in order to hold a non-contracting party liable as a joint venturer. Such elements must include, (1) a holding out by the parties sought to be charged, or permitting another to hold himself out as a joint venturer, and (2) reliance on or a changing of position by the third party on the holding out. *Hansen v. Burford,* 212 Cal. 100, 297 P. 908 (1931); 48 C.J.S. Joint Adventures § 14, p. 868.

■ Here, there is simply no evidence that Tiffany ever held itself out as a joint venturer to cross-appellants or allowed Kissinger to do so. Also, the contractual obligations sought to be enforced by cross-appellants were entered into prior to the date that the alleged joint venture was created, thus negating any reliance on the part of cross-appellants of the existence of such a relationship in extending credit to Kissinger. We therefore hold that the evidence does not support the trial court's finding that a joint venture relationship existed between Tiffany and Kissinger.

We turn now to what we consider to be the controlling issue of this litigation, that is, what is Kissinger's status in supplying type C chips to Tiffany in order to complete the highway contract—materialman or subcontractor.

This distinction becomes important because of the wording of Tiffany's bond. Under the terms of that bond, Tiffany bound itself to pay only materialmen who supplied material to itself, "laborers, mechanics, or subcontractors", but did not bind itself to pay suppliers of materialmen. Since cross-appellants are clearly suppliers of materials, if Kissinger is a subcontractor, Tiffany and Fireman's Fund are liable; if Kissinger is merely a material supplier himself, no liability attaches.

Courts have been struggling with this particular problem for many years. The struggle we feel is based upon an inability to articulate a comprehensive definition of a "subcontractor" as compared to a "mate-

rialman". The definition usually cited by the courts is similar to the following:

"A subcontractor is one who contracts for the performance of an act, with a person who has already contracted for its performance." *Wells-Stewart Construction Co. v. Martin Marietta Corp.*, 103 Ariz. 375, 377, 442 P.2d 119, 121 (1968).

Or, a subcontractor is:

"[O]ne who contracts to supply materials manufactured or processed especially for the general contractor and in accordance with special reference to his plans and specifications or those by which he is bound . . . ." *Holt & Bugbee Co. v. City of Melrose,* 311 Mass. 424, 426, 41 N.E.2d 562, 563 (1942).

The problem with these or like definitions is in applying them to individuals who are material suppliers. The normal construction contract, like the one present here, not only calls for the general contractor to perform the labor and skill to produce a finished structure, but also places upon the general contractor the obligation to supply the materials necessary to produce the finished product.

Thus, under the quoted definitions, any contract entered into by the general contractor with third parties to supply specific types of materials necessary to complete the project, makes the supplier of the materials a "subcontractor" for such material suppliers have by contract undertaken the performance of the contractor's obligation to supply the specific material.

When viewed in this light, ridiculous conclusions can be formulated. For example, Tiffany's contract with the State required it to use a specific type of asphalt base product in resurfacing the road. Tiffany in turn had to contract with a supplier of this specific asphalt for this product, probably an oil company. An oil company in turn might, by contract, hire individuals to produce the quality of oil necessary to make the asphalt and they in turn,

hired by contract, someone to drill a well that produced the oil. No one would seriously argue that the well driller, assuming that he could trace the oil produced by the well he dug to the asphalt placed by Tiffany on the road, could hold Tiffany liable for his wages. Yet, under the definitions, he could logically be classified as a supplier to a "subcontractor"—each person in the chain having performed their work by contract and at each stage changed the basic material according to specification in some manner to reach the final specifications required by Tiffany's contract.

In our opinion, then, any determination of whether a person is a "subcontractor" or a "materialman" cannot be tested against a black letter formula, but must be considered in the light of all the circumstances. In reaching this determination, the following factors are to be considered.

(1) Does the custom in the trade consider the supplier a subcontractor or a materialman? *See, Huddleston v. Nisler,* 72 S. W.2d 959 (Tex.Civ.App.1934).

(2) Are the items supplied generally available in the open market or are they "customized"? *See United States v. Beatty,* 350 F.2d 287 (6th Cir. 1965); *Basich Brothers Construction Co. v. United States,* 159 F.2d 182 (9th Cir. 1946); *Austin Bridge Co. v. Drake,* 79 S.W.2d 677 (Tex.Civ.App.1935).

(3) In determining whether the material is "customized" do the plans and specifications call for a unique product, or are these specifications merely descriptive of what is to be furnished? *See United States v. Lembke Construction Co.,* 370 F. 2d 293 (10th Cir. 1966); *Theisen v. County of Los Angeles,* 54 Cal.2d 170, 5 Cal. Rptr. 161, 352 P.2d 529 (1960).

(4) Does the supplier's performance constitute a substantial and definite delegation of a portion of the performance of the prime contract? *See United States v. Lembke Construction Co., supra; Theisen v. County of Los Angeles, supra.*

Applying these factors to the facts in this case, the evidence failed to disclose what the custom was in the paving contract industry as to the classifications of suppliers of type C chips as being either subcontractors or materialmen, although it appears Kissinger did not have a contractor's license, lending credence to the inference that he did not consider himself a subcontractor. Moreover, there was evidence that the use of type C chips in seal coating operations was not unique in the sense that this particular project was the only one in the state using this classification of covering; rather the evidence showed that most sealcoating operations in the state called for these chips. Also, while type C chips had to be "manufactured" for each particular job because of their inability to be stockpiled, these chips were generally available in the open market from sand and gravel companies. We are therefore drawn to the conclusion that the specifications calling for type C chips were not specifications requiring the manufacture of a unique product but merely descriptive of the type of product to be furnished.

Turning to the last factor to be considered, it appears that the total bid by Tiffany for the sealcoating project was $46,590.20. Tiffany agreed to pay Kissinger $18,600 for the type C chips to be applied. It would thus appear that considering cost only, the supplying of type C chips was a substantial portion of the prime contract. We do not consider this factor to be of particular significance when weighed against other factors involved and the type of job to be performed. Materials as such, in this job, made up the major portion of the cost of this project. However, it was the application of these materials to the existing surface of the highway which was the real consideration of the contract between the State and Tiffany. Kissinger in no manner contracted for part of Tiffany's performance of this essential portion of that contract. We are therefore of the opinion that Tiffany did not delegate a material portion of its contract that it was obligated to perform.

By reason of the foregoing, we hold that the trial court correctly determined that Kissinger's status was that of a materialman and not a subcontractor. By reason of Kissinger's status, cross-appellants were materialmen supplying another materialman and as such have no claim on Tiffany or its bonding company up to September 4, 1968.

On September 4, 1968, Tiffany took over the production of type C chips from Kissinger. While we have held that there is no evidence to support a joint venture agreement between Tiffany and Kissinger after that date, there is evidence to support an employer-employee relationship. Further, there is evidence that Kissinger became job superintendent for Tiffany on that date with complete authority to run the project. In this capacity, Kissinger testified that he kept the Hancock & Kelley crusher on the job as a "back-up" to the Tiffany crusher because that crusher was having problems. In our opinion, such a decision was within the scope of authority delegated to him by Tiffany and as such, became binding upon his employer. *Logan v. O. S. Stapley Co.,* 14 Ariz.App. 65, 480 P.2d 680 (1971). Also, there is no dispute that the fuel supplied by Diversified after September 4, 1968 was consumed in Tiffany's production of type C chips.

We therefore hold that after September 4, 1968, cross-appellants were materialmen supplying the general contractor and as such were entitled to have their claims paid by Tiffany and its bonding company. The trial court's judgment can be sustained on this basis, although the basis utilized by the trial court was incorrect. In re Estate of Sherrill, 92 Ariz. 39, 373 P.2d 353 (1962).

For the foregoing reasons, the judgment of the trial court as between Tiffany and cross-appellants is affirmed.

■ The answering brief filed by Tiffany to cross-appellants cross-appeal does not direct itself to the issue raised as to interest or the right of cross-appellants to attorney's fees on appeal. Having failed to address itself to these issues, the Court must conclude that Tiffany agreed they are collectible if this Court failed to reverse as to any claim of cross-appellants. *Bulova Watch Co. v. Super City Department Stores*, 4 Ariz.App. 553, 422 P.2d 184 (1967).

We therefore hold that cross-appellants are entitled to interest at the legal rate from October 19, 1968, on their respective claims. The court also awards cross-appellants their attorney's fees on appeal against Tiffany in the sum of $1,000.00.

This matter is remanded to the trial court with directions to modify its judgment in accordance with this opinion.

HAIRE, C. J., Division 1, and EUBANK, J., concur.